IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

MICHAEL HARRIS                                                                                          PLAINTIFF

     V.                    Civil No. 2:21-cv-02177-PKH-MEF

KILOLO KIJAKAZI, Acting Commissioner,
Social Security Administration                                                                          DEFENDANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

     Plaintiff, Michael Harris, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (the "Commissioner") denying his claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act (hereinafter "the Act"), 42 U.S.C. § 423(d)(1)(A).  In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  *See* 42 U.S.C. § 405(g).

     **I.**     **Procedural Background**

     Plaintiff filed his application for DIB on May 1, 2019, alleging disability since July 31, 2018, due to post-traumatic stress headaches, cognitive and memory problems, and high blood pressure.  (ECF No. 12, pp. 66, 159-160, 180).  After his claim was denied on initial review and on reconsideration, and administrative hearing was held on November 25, 2020.  (*Id*. at 37-65).  Plaintiff was present and represented by counsel.

     Born in 1982, the Plaintiff was 36 years old on his alleged onset date and possessed a high school education.  (ECF No. 12, p. 31).  He had past relevant work ("PRW") experience as a fence installer, welder, and lead machine operator.  (*Id*. at 30, 181, 188-195, 214-224).

     On December 24, 2020, the Hon. Scot Gulick, Administrative Law Judge ("ALJ"), identified Plaintiff's cervical disk disease, post-concussion syndrome, traumatic brain injury

("TBI"), and neurocognitive disorder as severe impairments. (ECF No. 12, p. 22). He concluded Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, and that he retained the RFC to perform medium work with occasional climbing of ladders/scaffolds, and frequent climbing of ramps/stairs, balancing, stooping, kneeling, crouching, and crawling. (*Id*. at 23, 25). From a mental perspective, the ALJ found the Plaintiff capable of performing simple, routine, and repetitive tasks, involving occasional interaction with the public and simple work-related decisions. (*Id*. at 26). Further, he noted the Plaintiff would not be able to perform at a production rate pace. (*Id*.). With the assistance of a vocational expert ("VE"), the ALJ then determined he could perform work as a kitchen helper, laundry worker, and housekeeper. (*Id*. at 31-32).

The Appeals Council denied Plaintiff's request for review on August 27, 2021. (ECF No. 12, pp. 5-10). Plaintiff subsequently filed this action on December 8, 2021. (ECF No. 3). Both parties have filed appeal briefs (ECF Nos. 16, 17), and the matter is ready for Report and Recommendation.

## II.     Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance but enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the record to support the Commissioner's decision, the Court may not reverse it simply because substantial evidence

exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § 404.1520(a)(4). The fact finder only considers Plaintiff's age, education, and work experience in the light of his RFC if the final stage of the analysis is reached. 20 C.F.R. § 404.1520(a)(4)(v).

### III.     Discussion

In a single issue on appeal, the Plaintiff insists that the ALJ's RFC determination is not supported by substantial evidence. After a thorough review of the record, the Court agrees.

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545. While a claimant's RFC must be based on some medical evidence of his ability to function in the workplace, there is no requirement that an RFC finding be supported by a specific medical opinion. *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007); *Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013). It is "ultimately an administrative determination reserved to the Commissioner." *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012) (quoting *Cox*, 495 F.3d at 619-20). However, the ALJ adjudicates a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations. *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009). When the record contains conflicting evidence from treating and examining physicians, it is the ALJ's function to resolve those conflicts. *Tindell v. Barnhart*, 444 F.3d 1002, 1005 (8th Cir. 2006) (quoting *Vandenboom v. Barnhart*, 421 F.3d 745, 749–50 (8th Cir. 2005) (internal marks omitted)).

On August 25, 2017, the Plaintiff suffered a broken jaw and a TBI when he was struck by a motor vehicle and thrown approximately 20 feet. (ECF No. 12, pp. 269-315). He was air lifted to Research Medical Center for a concussion with loss of consciousness, a mildly displaced fracture of the base of the left mandibula, and a nondisplaced right mandibular body fracture. Plaintiff was awake at the scene but shortly before landing became unresponsive, stopped breathing, and required intubation. Although CT scans showed no acute intracranial, cervical, thoracic, or lumbar spine abnormalities, he was placed in intensive care for monitoring. The

following day, Plaintiff underwent the surgical repair of his jaw, to include wiring and internal fixation, without complication. He was discharged on August 27, 2017, with prescriptions for Chlorhexidine Gluconate mouthwash and Amoxicillin. X-rays of his mandible taken the following month revealed a fracture of the left mandibular neck with bony overlap and good alignment. (ECF No. 12, p. 317).

Plaintiff returned to work as a welder after his accident but was terminated in October 2018. (ECF No. 12, pp. 342-344, 386-388). He began working in maintenance in April 2018, but he quit in July due to headaches, dizzy spells, and difficulty concentrating, focusing, and remembering.

On July 31, 2018, Plaintiff received emergency treatment for complaints of muscle cramping and tingling in his hands. (ECF No. 12, pp. 586-605, 613-628). His blood pressure was 167/104 and his lab results revealed an electrolyte imbalance. Plaintiff admitted a history of hypertension for which he had not taken medication since his August 2017 accident. Therefore, the doctor admitted him for observation and administered Potassium Chloride and Ondansetron. A transthoracic echocardiogram was normal, revealing no evidence of stenosis or pericardial effusion. (ECF No. 12, pp. 445-448). Only trivial tricuspid valve regurgitation was noted. The doctor diagnosed hypokalemia, dehydration, hypertension, muscle cramps, nausea and vomiting before discharging him the following day with a prescription for Lisinopril.

On August 9, 2018, Plaintiff returned to the emergency room ("ER") with a headache, generalized upper body numbness, a near syncopal episode, lightheadedness, and dizziness that presented 15 minutes after starting work. (ECF No. 12, pp. 373-378, 576-584, 630-638). His neurological exam was intact, revealing full orientation, no motor or sensory deficits, and normal

speech. However, the Plaintiff's blood pressure remained elevated at 153/83 and his potassium was low. He was again administered Sodium Chloride.

The following day, Plaintiff presented to his treating physician, Dr. Ram Chandra, with persistent symptoms. (ECF No. 12, pp. 361-363, 410-412, 439-441). Following a normal exam, Dr. Chandra diagnosed essential hypertension, cervical disk disease with myelopathy, and a TBI. He recommended an MRI of his brain and cervical spine, prescribed Gabapentin, and refilled his Lisinopril.

An MRI of Plaintiff's brain, conducted on September 12, 2018, was normal, revealing no acute intracranial ischemia, hemorrhage, hydrocephalus, or enhancing mass and minimal white matter disease. (ECF No. 12, pp. 442-444, 571-572, 640-641).

On September 20, 2018, Plaintiff returned with complaints of a headache on the entire right side of his head. (ECF No. 12, pp. 358-360, 436-438). The pain made him nauseous and off balance at times. Plaintiff had been taking Ibuprofen with minimal relief and rated his pain as seven on a 10-point scale. Following a normal exam, Dr. Chandra diagnosed a post-concussion headache. He prescribed Gabapentin, Prednisone, and Amitriptyline. Dr. Chandra also signed off on Plaintiff's claim for short-term disability benefits, indicating that his disability was the result of an "MVA" in August 2017. (ECF No. 12, pp. 350-353, 407-409). Dr. Chandra opined Plaintiff could occasionally sit, lift 50 pounds, and reach above; frequently lift up to 10 pounds, bend/stoop, push/pull, and fine manipulate; continuously stand and walk; and never lift more than 50 pounds or drive. He also indicated that the Plaintiff was "totally disabled" from July 31, 2018, through January 1, 2019.

The next day, Dr. Chandra documented a weight gain of approximately 20 pounds. (ECF No. 12, pp. 404-406, 433-435). He credited this to Plaintiff's alcohol cessation and cravings for

sweets. Plaintiff also complained of left forearm pain and a persistent headache, which he had been experiencing since the accident. It was reportedly worse in the morning, prior to taking his medication. An exam revealed no abnormalities. Dr. Chandra was of the opinion Plaintiff's headaches might resolve on their own now that he had quit drinking. He also indicated that he would not prescribe a narcotic to treat Plaintiff's back pain, due to his history of alcoholism.

On November 19, 2018, Dr. Chandra treated the Plaintiff for mood swings. (ECF No. 12, pp. 401-403, 430-432). He was reportedly experiencing significant agitation with little things. On exam, Plaintiff was alert and fully oriented with an appropriate mood and affect. After diagnosing reactive depression, Dr. Chandra prescribed Fluoxetine and Clonazepam.

One month later, Plaintiff conferred with neurologist, Dr. Robert Reddig. (ECF No. 12, pp. 342-344, 386-388). He was alert, fully oriented, and in no acute distress. On exam he exhibited normal memory; intact extraocular movements; full visual fields in all four quadrants; a normal fundoscopic exam; normal facial strength and sensation; normal hearing; normal tongue and palate movement; normal shoulder movement; down going toes to plantar stimulation; normal sensation to light tough, temperature, vibration, and proprioception in all four extremities; normal finger-to-nose coordination; and a normal gait. Dr. Reddig believed that Plaintiff's dizzy spells were panic attacks with poorly defined dizziness and whole body paresthesias. Accordingly, he increased Plaintiff's Amitriptyline dosage, referred him for comprehensive concussion clinic support, and continued the Gabapentin

On December 21, 2018, Dr. David Dyck evaluated the Plaintiff for post-concussion syndrome. (ECF No. 12, pp. 421-424, 462-465, 467). With the increased dose of Amitriptyline, Plaintiff indicated that his headaches had somewhat improved. His activity remained limited, however, due to dizziness, and difficulty concentrating, focusing, and remembering. An exam

showed him to be alert and fully oriented with an abnormal convergence (vision), heel to toe walk, and sway and balance errors. A post-concussion symptom score sheet revealed moderate to severe symptomology. For diagnoses of vestibular disequilibrium (unsteadiness/imbalance) and cognitive complaints, Dr. Dyck advised him to continue the Amitriptyline and provided concussion care instructions.

On January 3, 2019, Plaintiff presented for an initial physical therapy ("PT") evaluation with therapist Rodney McCaslin. (ECF No. 12, pp. 333-336). He complained of positional vertigo, lightheadedness, imbalance, nausea, tinnitus, headaches, and a rocking sensation, rating his pain as 6/10. However, his gait was within normal limits and a vestibular autorotation test was negative. Therapist McCaslin noted a decreased range of motion in his cervical spine and moderate to severe difficulty with transitional movement, reading, quick movements, as well as difficulty with strenuous activities.

One week later, Plaintiff reported falling at his home, injuring his right hand. (ECF No. 12, pp. 330-332). He also indicated that his dizziness, neck pain, and stiffness persisted, rating his pain as a 4/10. Performing his home exercises also made him dizzy.

On January 18, Plaintiff reported light dizziness with bending over and a pain rating of 4/10. (ECF No. 12, pp. 327-329). His main complaint was neck pain/stiffness and a headache, despite compliance with his home exercise program. On exam, therapist McCaslin noted a normal gait, and opined that the Plaintiff should continue therapy.

On February 1, 2019, Plaintiff presented in the ER with slurred speech, numbness in his upper extremities, and an unsteady gait. (ECF No. 12, pp. 522-552, 658-688). After being out of Prozac and Gabapentin for several days, he had resumed both the previous day. Moments thereafter, his symptoms began. His wife, however, reported longstanding issues with intermittent

slurred speech and facial droop. On exam, the Plaintiff was awake, alert, fully oriented, and in no acute distress, but his blood pressure was 156/102 and he had an alcohol level of 69. Inspection of his extremities revealed no swelling, tenderness, or deformities. Further, a CT scan and MRI of his head revealed no evidence of intracranial hemorrhage, ischemia, enhancing mass lesions, or hydrocephalus. A CT scan of his neck and carotid showed no evidence of significant stenosis in the carotid or vertebral arteries. And an angiogram of the head was also unremarkable. Plaintiff was administered Labetalol HCL, Sodium Chloride, and Ondansetron HCL. After showing improvement, he was discharged with diagnoses of hypertensive urgency, facial droop, and paresthesias. Doctors believed the absence of Prozac and the presence of alcohol were responsible for his mental status.

In February 2019, Therapist McCaslin discharged the Plaintiff from physical therapy for noncompliance, noting that he attended only three sessions. (ECF No. 12, pp. 324-326).

On March 7, 2019, Plaintiff advised Dr. Reddig that the increased dose of Amitriptyline had decreased the intensity of his headaches but only improved his sleep for approximately one week. (ECF No. 12, pp. 338-340). He continued to experience sleep problems, daily headaches, and dizziness made worse with turning and standing. Plaintiff had completed three PT sessions before losing his insurance and was now having a difficult time getting an appointment with the concussion clinic. He asked about going back to work, but Dr. Reddig advised him that the concussion clinic would inform him when he could do so. He noted many symptoms, including alcohol usage, gastrointestinal issues, mood issues, dizziness, paresthesias, and headaches that appeared to be related to his TBI. He recommended Plaintiff return to PT, schedule an appointment with the concussion clinic, and consult with a psychiatrist. In the meantime, Dr. Reddig continued the Amitriptyline and added Propranolol, since his heart rate and blood pressure were elevated.

On March 14, 2019, the Plaintiff returned to Dr. Dyck. (ECF No. 12, pp. 414-417, 458-461). He reported intermittent headaches, for which Propranolol was somewhat helpful, and a frustrated mood. On exam, he was alert and fully oriented with an abnormal sway and balance tremors; a positive Romberg; abnormal heel to toe walking; normal sensation and full motor strength in all extremities; a normal affect; good eye contact; normal speech; and abnormal convergence. Dr. Dyck advised the Plaintiff to restart PT, referred him for an eye exam, and recommended a neuropsychological consult.

On March 15, Plaintiff followed up with Dr. Chandra after having a possible "mini stroke." (ECF No. 12, pp. 426-429). He was taking the Propranolol, as ordered by Dr. Reddig, but needed a refill of Prozac. Physical and neurological exams, however, were within normal limits, and the Plaintiff reported mild to moderate concussive symptoms. Dr. Chandra refilled his Gabapentin, Amitriptyline, Lisinopril, and Fluoxetine, and prescribed Protonix.

On March 22, 2019, a speech pathologist, Maria Mulvey, evaluated Plaintiff for post-concussion syndrome and a cognitive communication deficit. (ECF No. 12, pp. 515-518, 698). On exam, he was noted to have problems with deductive and inductive reasoning; motivational drive; organization/coordination; paying attention and remembering (recent and immediate); and planning. These deficits were confirmed by the Standardized Touchscreen Assessment of Cognition ("STAC"). Ms. Mulvey diagnosed moderate cognitive communicative deficits impacting executive function, short term recall, visual attention, working memory, sustained attention and scanning, visual attention, and visual spatial relationships. As such, she believed one-on-one direct therapy to address cognitive communications was a medical necessity to promote safety and independence in his environment.

During a return visit to Dr. Dyck that same day, Plaintiff voiced no improvement in his symptoms. (ECF No. 12, pp. 454-457, 466). He continued to experience intermittent headaches, and he reported limited activity due to his symptoms, which included difficulty concentrating, focusing, and remembering. Noting a firm double leg stance with abnormal sway and balance errors, Dr. Dyck recommended the Plaintiff see Dr. Price, referred him to Dr. Riddell for an evaluation of his visual disturbances, and advised him to continue PT and speech therapy for his cognitive complaints. He also increased Plaintiff's Propranolol dosage to control his headaches more fully.

Speech pathology treatment notes dated April 3, 2019, indicate the Plaintiff did not feel well and was out of his daily medications. (ECF No. 12, p. 711). He required minimal cues for alternation attention tasks with 60 percent accuracy; minimal cues for image association with 70 percent accuracy; moderate cues for divergent thinking tasks with 60 percent accuracy; and moderate cues for generation of effective solutions with 70 percent accuracy.

On April 9, 2019, Plaintiff complained of a new injury involving his left shoulder and left clavicle. (ECF No. 12, pp. 482-488, 713-719). He had recently fallen off his porch. Plaintiff rated his pain as 9/10. An exam revealed tenderness in the left shoulder with a reduced range of motion, while x-rays showed mild osteoarthritis of the acromioclavicular joint. The doctor diagnosed arthralgia of the left shoulder. Accordingly, his left arm was placed in a sling with instructions to remove the arm three to four times daily to perform range of motion exercises, and Norco was prescribed.

On April 15, Plaintiff returned to PT with complaints of left shoulder pain and a headache, which he rated as a 7/10. (ECF No. 12, pp. 494-495, 503, 703-704, 710). He was also wearing an

arm sling. Although he was prescribed pain medication at the ER, he had not taken it this morning. After therapy, his pain reduced to a 6/10.

Two weeks later, Plaintiff rated his pain as an 8/10. (ECF No 12, pp. 492-493, 502, 701-702, 709). He reported several falls since his last visit. The physical therapist noted that he did not perform all the exercises due to a high pain level, but his pain decreased to 7/10 after therapy.

Between May 10, 2019, and May 31, 2019, Plaintiff received speech/language therapy for diagnoses of labyrinth dysfunction, postconcussion syndrome, cervicalgia, cognitive communication deficit, unspecified symptoms and signs with cognitive functions and awareness, and repeated falls. (ECF No. 12, pp. 473-477, 721-724). He worked on tasks to increase his cognitive talk.

In early June 2019, Plaintiff completed a headache questionnaire, indicating he experienced constant headaches. (ECF No. 12, pp. 199-200). He identified smells, nausea, and high pitch sounds as associated symptoms, with precipitating factors to include heat, height, and flickering florescent lights. His prescription medications included Gabapentin, Amitriptyline, Propranolol, and the occasional Tylenol. Plaintiff also utilized ice therapy. However, despite these treatment modalities, he indicated that his headaches interfered with his ability to perform routine activities 50 to 75 percent of the time.

Three weeks later, Dr. Chandra treated the Plaintiff for essential hypertension and cervical disk disease with myelopathy. (ECF No. 12, pp. 735-737). His blood pressure remained elevated at 158/110. Dr. Chandra prescribed Cyclobenzaprine and Lisinopril and Hydrochlorothiazide ("HCTZ"). In July, his blood pressure decreased to 140/102. (ECF No. 12, pp. 734).

On August 8, 2019, Dr. Chandra reevaluated Plaintiff's medications due to reports of increased agitation. (ECF No. 12, pp. 730-733). He also wished to discuss his paperwork for

long-term disability. A physical exam was normal, resulting in continued diagnoses of essential hypertension, alcoholism, and depressive disorder. Dr. Chandra refilled his Lisinopril-HCTZ, prescribed an Antabuse tablet, increased his Prozac dosage, and discontinued the Fluoxetine.

In late August, Plaintiff told consultative examiner, Dr. Sean Sargent, that he was applying for disability due to medical problems resulting from a head injury. (ECF No. 12, pp. 745-752). He complained of light-headedness/dizziness, as well as blurred vision. Dr. Sargent documented an unkempt beard, lethargic movements and speech, a flat and unresponsive tone of voice, and some difficulty recalling dates and information, noting that the Plaintiff relied primarily on his wife for specific details. He reportedly spent his days trying to "find stuff to tinker with," although it now took him much longer to complete tasks. His performance on the Wechsler Memory Scale Fourth Edition placed him in the very low range in comparison to his peers. He struggled to say the name of the months backwards, omitting some of the months. There was delay in some of his responses and he committed several errors on a task requiring him to reverse the names of shapes. Further, his auditory memory, visual working memory, and immediate memory indexes were in the low average range, while his visual memory and delayed memory indexes were in the average range. Dr. Sargent diagnosed an unspecified neurocognitive disorder, noting the Plaintiff would struggle with the following: recalling information heard orally; performing tasks that require him to manipulate and retain visual information in memory while solving a problem; immediately recalling auditory and visual information; performing tasks requiring the use of auditory memory; interacting well with others due to memory issues; and adapting adequately. He also found Plaintiff would have significant difficulties in a normal work setting and appropriately managing resources.

On September 12, 2019, Dr. Reddig treated Plaintiff for complaints of headaches. (ECF No. 12, pp. 753-755). A physical exam revealed no acute distress, a normal fund of knowledge, normal facial strength with intact sensation and hearing, normal bulk and motor strength throughout, intact sensation in all extremities, normal finger-to-nose coordination, and outward turned feet. Dr. Reddig encouraged the Plaintiff to continue both PT and speech therapy, continued the Amitriptyline and Gabapentin, and increased his Propranolol dosage.

On September 17, 2019, Dr. Harry Cole reviewed the record and concluded the Plaintiff could perform medium work with occasional climbing of ladders/ropes/scaffolds, and frequent climbing of ramps/stairs, balancing, stooping, kneeling, crouching, and crawling. (ECF No. 12, pp. 76-77).

On September 18, 2019, agency physician, Dr. Mark Altomari, completed a mental RFC assessment. (ECF No. 12, pp. 72-74). After reviewing the evidence of record, he concluded the Plaintiff suffered from a neurocognitive disorder, depressive disorder, and personality/impulse control disorder that resulted in moderate limitations in the ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. He also assessed moderate limitations in the following areas: remember locations and work-like procedures; understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; interact appropriately with the general public; respond appropriately to changes in work setting; and travel in unfamiliar places or use public transportation. (*Id*. 77-79).

Two days later, while the Plaintiff was in jail for the unlawful use and possession of a weapon, he required emergent treatment for chest pain, which was later determined to be caused

by anxiety and suicidal ideations mixed with mild alcohol withdraw. (ECF No. 12, pp. 756, 763-1121). It should be noted that he had been off his medications for two days. And, after consuming a pint of Vodka his wife purchased for him, the Plaintiff placed a gun on the table and suggested that his wife and his friend shoot him. Accordingly, he was admitted and transferred to the inpatient psychiatric unit the following day. At the time of admission, Plaintiff was alert, fully oriented, and cooperative with an appropriate mood and affect. He was discharged on September 27, 2019, after showing improvement with the addition of Hydroxyzine.

On April 8, 2020, Plaintiff established care with Dr. Hubert Landers. (ECF No. 12, pp. 1129-1131). Plaintiff reported difficulty remembering things and staying awake. An exam confirmed his memory issues, evidencing the inability to remember over 2/3 of the objects presented. Further, he was off balance. Dr. Landers diagnosed leukoplakia, high blood pressure, and a TBI. He prescribed Lisinopril-HCTZ, Depakote, Cyclobenzaprine, and Amitriptyline.

In July 2020, Dr. Landers indicated that the Plaintiff was 100 percent disabled, as per his April 8, 2020, note. (ECF No. 12, p. 760).

On August 5, 2020, during a follow-up with Dr. Landers, the doctor again noted that the Plaintiff was not safe to return to work. (ECF No. 12, pp. 1142-1143). He diagnosed hyperlipidemia, intellectual disability, leukoplakia, high blood pressure, and a TBI. Dr. Landers prescribed Fenofibrate and provided educational resources.

The following day, Dr. Landers completed an Organic Brain Impairment/Off Task Questionnaire. (ECF No. 12, pp. 1124-1126). He indicated that Plaintiff's prognosis was poor. As result of his TBI, he suffered from disorientation to time and place; memory impairment; perceptual or thinking disturbances; changes in personality; disturbances of mood; emotional lability; and impairment in impulse control. Further, Dr. Landers assessed marked restrictions in

his ability to perform activities of daily living and function socially. He also noted deficiencies in concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner; repeated episodes of deterioration or decompensation in work or work-like settings which caused him to withdraw from the situation or experience exacerbation of signs and symptoms; a medically documented history of chronic organic mental disorder of at least two years' duration causing more than a minimal limitation in ability to perform work activities with symptoms or signs currently attenuated by medication or psychological support; a residual disease process that had resulted in such marginal adjustment that even a minimal increase in mental demands or changes in environment would be predicted to cause the individual to decompensate; and a history of one or more years' inability to function outside a highly supportive living arrangement.

Additionally, Dr. Landers reported a marked impairment in Plaintiff's ability to understand, remember, and carry out short, simple, and detailed instructions; concentrate for extended periods of time; perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with and proximity to others without being distracted by them; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of breaks; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make

plans independently of others. Dr. Landers was adamant that the Plaintiff would never be safe to employ again.

Despite this evidence, the ALJ concluded that the Plaintiff could perform medium work that required frequent climbing of ramps/stairs, balancing, stooping, kneeling, crouching, and crawling, and only occasional climbing of ladders/scaffolds. (ECF No. 12, pp. 23, 25). He specifically found that the opinions of Drs. Chandra, Sargent, and Landers were largely inconsistent with the overall weight of the record and adopted the assessments of the non-examining consultants. While we recognize that the RFC determination is ultimately a determination left to the ALJ, the ALJ must base his decision on the medical evidence of record. *See Jones*, 619 F.3d at 971. And the present record lacks substantial support for the ALJ's RFC determination.

The record is replete with evidence documenting the Plaintiff's dizziness and balance issues, rendering him a fall risk. (ECF No. 12, pp. 333-336, 358-360, 414-417, 421-424, 436-438, 454-467, 1129-1131). In fact, he reported falling on several occasions. (*Id*. at 330-332, 473-477, 482-488, 492-493, 502, 701-702, 709, 713-719, 721-724). Accordingly, it would not be safe to allow him to climb anything occasionally, much less frequently, and he should not work near hazards or moving machinery.

The evidence documenting his treatment for post-concussion syndrome[1] also call into question the ALJ's determination that the Plaintiff could perform simple, routine, and repetitive tasks involving occasional interaction with the public and simple work-related decisions. (ECF No. 12, p. 26). As previously noted, Dr. Landers indicated that Plaintiff suffered from numerous marked restrictions that rendered him unsafe to employ. (ECF No. 12, pp. 1124-1126). These

---

[1] Contrary to the ALJ's reliance on the MRI scans of the Plaintiff's brain, neither a concussion nor post-concussion syndrome can be detected by an MRI.

restrictions are bolstered by records from Plaintiff's speech pathologist, who assessed the Plaintiff with moderate cognitive communicative deficits impacting, among other things, his executive functioning (working memory, flexible thinking, and self-control), reasoning abilities, and attention. (*Id*. at 711). Further, Dr. Sargent also noted memory problems that impacted the Plaintiff's ability to recall auditory and visual information, interact well with others, adapt adequately in a normal work setting, and appropriately manage resources. (*Id*. at 742-752). Therefore, we find that the ALJ's assessment fails to fully account for all the Plaintiff's limitations.

Accordingly, on remand, the ALJ should obtain a consultative neuropsychological exam, complete with a detailed RFC assessment, to evaluate the exact impact Plaintiff's TBI has on his ability to perform work-like tasks. This assessment should account for both the physical and mental limitations stemming from the Plaintiff's TBI.

### IV. Conclusion

For the reasons stated above, I recommend reversing and remanding this case to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 5th day of October 2022.

/s/ *Mark E. Ford*
HON. MARK E. FORD
CHIEF UNITED STATES MAGISTRATE JUDGE